**The below described is SIGNED.**

**Dated: January 17, 2008** _____

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**



_____
_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Thawatchai N. Puakta,<br><br>Debtor. | Bankruptcy Number: 03-40336<br><br>Chapter 7 |
| Arunee Schwab, Van Chindachai, Sawing Wilson, Vanlop Tayana, Thomgmak Blair, Israt Rittiron, Narong Saipang, Prasatporn Thamklang, Namphon Methawachirawut, and Janya Boonkratuang,<br><br>Plaintiffs,<br><br>v.<br><br>Thawatchai N. Puakta,<br><br>Defendant. | Adversary Proceeding No. 04-2820<br><br>Judge Judith A. Boulden |

### MEMORANDUM DECISION

The Wat Dhammagunaram of Utah (the "Wat") is a Buddhist temple and nonprofit

corporation located in Layton, Utah. The Wat acts as a place of worship and a place of gathering

and celebration for the Buddhist faithful and the Buddhist monks who live in homes located near

the Wat. Between approximately 1992 and 2003 the Defendant, Thawatchai N. Puakta

(Thawatchai or Defendant), served as the abbot of the Wat. During this period, the Defendant

also served as the Director of the Board of Trustees for the nonprofit corporation (Board). It is

in his roles of Director and abbot that the Plaintiffs Arunee Schwab, Van Chindachai, Sawing

Wilson, Vanlop Tayana, Thomgmak Blair, Israt Rittiron, Narong Saipang, Prasatporn Thamklang,

Namphon Methawachirawut, and Janya Boonkratuang (collectively the "Plaintiffs"), who are

members of the Wat, claim that the Defendant commingled funds, absconded with money, and

otherwise improperly managed the finances of the Wat. Specifically, Plaintiffs argue that the

Defendant committed defalcation while acting in a fiduciary capacity and that he acted under false

pretenses, both of which would give rise to a nondischargeability judgment under 11 U.S.C.

§ 523(a)(2)(A) and (a)(4).[1]

The Court received evidence and heard argument at trial and took the matter under

advisement. The Court has now considered the evidence properly before it, has judged the

credibility of the witnesses, and has made an independent inquiry into applicable case law. Now

being fully advised, the Court hereby issues the following Memorandum Decision.

## I.   FACTS

The Wat was established in 1979. In 1985, the location of the Wat was moved to its

current site at 644 E. 1000 N., Layton, Utah. Sometime in 1992, the Defendant became the abbot

---

[1]      All future statutory references are to title 11 of the United States Code unless otherwise
indicated. The Court notes that the Plaintiffs asserted a claim for relief in the Pretrial Order alleging
embezzlement under § 523(a)(4), but the Plaintiffs indicated after trial that they had not carried their
burden of proof regarding the alleged embezzlement and were abandoning that claim. Therefore the claim
for relief premised upon embezzlement under § 523(a)(4) is dismissed.

of the Wat and served in that position until approximately November 2003. As abbot, the

Defendant was responsible for conducting religious ceremonies, supervising the monks at the

Wat, and presiding over the Buddhist faithful who attended services at the Wat.

### A.    Wat Governance

The Defendant also acted as the Director[2] of the Wat's Board. The Board was established

by the Wat's Articles of Incorporation. The specific duties of the Director and the Board were

defined by the nonprofit corporation's bylaws. The duties of the Director in both the original and

amended bylaws includes general duties commensurate with appropriate corporate governance.

The Articles of Incorporation and the original and amended bylaws do not expressly establish a

trust or a trust relationship between the Director and the members. In addition, the Articles and

bylaws do not include a description of any trust res.

While the Defendant acted as abbot and Director of the Board, the corporate governance

of the Wat left something to be desired. Board meetings were held while the Defendant acted as

Director, but it is unclear from the evidence presented if these meetings were held at regular

intervals or on an ad hoc basis. The Defendant conducted these meetings and instructed those in

attendance about the issues or problems currently facing the Wat. One monk testified that

members did not vote on issues at these meetings; instead, the Defendant would inform the Board

of the problems and tell them how the problems would be resolved.

---

[2]       The parties have consistently referred to the leader of the Board of Trustees as the
"director"; however, the Articles of Incorporation list only the following elected officers: the President, the
First Vice-President, the Second Vice-President, the Secretary and Assistant Secretary, The Treasurer and
Assistant Treasurer(s), and the Trustee(s). The designation of "Director" doesn't appear until 2000 when
the Wat's bylaws were amended. Paragraph 2.c. of Chapter X of the amended bylaws titled Committee's
Powers and Duties  indicates that "[t]he Abbot or Head Monk is the Director of the Board of Trustees of
the Wat Dhammagunaram of Utah by the authority of his position." The Court will use the designation of
Director to refer to the leadership position on the Board.

### B.      The Wat's Financial Operations

The financial operation of the Wat under the Defendant's leadership was also irregular.

Funds to operate the Wat come from three primary sources: member donations; various fund

raising efforts; and loans from Wat members.  Members can donate to the Wat by dropping

money into the collection box at the temple.  Money trees are also utilized.  The Wat members

attach cash to the money trees for the benefit of the Wat.  Members also make donations when

ceremonies are performed at the temple or at another location outside of the temple grounds.

When these donations are made ,there are usually two components to the donations.  The member

making the donation will often place a portion of the donation into an envelope designated for the

Wat.  Another envelope, with approximately $50 in it, is sometimes given personally to the monk

who has performed the service.  The members also make in-kind donations to the temple.  These

donation procedures were also utilized while the Defendant acted as abbot and Director.  While

the Defendant acted as abbot of the Wat, he and other monks would collect these donations from

the members.   The Defendant testified that other monks were responsible for accounting for the

donations made directly to the Wat and that he kept track of the donations made to him

personally.  The Defendant also testified that he donated most of the personal donations he

received to the Wat.

A principal source of income for the Wat is various food fairs conducted throughout the

year.  The largest of these food fairs is the Living Traditions Festival that is held each May in Salt

Lake City.  The Wat participates as a vendor in this festival and consistently raises $14,000 to

$16,000 each year at this festival.  The Wat also participates in smaller municipal food fairs and

holds weekend food fairs at the temple.  The money raised at these food fairs is intended to

benefit the Wat.  In addition to food fairs, the Wat hosts other festivities at the temple to raise

money.  One example of this was an invitation to various Buddhist singers to perform at the temple.

Wat members also make loans to the Wat for various purposes including acquisition of capital assets.  The Wat members expect these loans to be repaid eventually, although apparently the terms and conditions of repayment are informal and in keeping with the variable nature of the Wat's income.  Usually these arrangements are verbal but the Court did receive testimony from one witness who prepared a promissory note that the Defendant signed after loaning money to the Wat.

The Wat's expenses include all requirements for the physical maintenance of the temple and housing for the Wat's monks (including mortgage payments, repairs, utilities and taxes), the living expenses and maintenance of the Wat's monks, support for the Wat's fundraising efforts, and other expenses incident to conducting religious ceremonies of the Wat.  The Wat had a checking account that it used to pay some of the Wat expenses, but some of its expenses were paid with cash instead of by check.  It also appears that there were times when the Wat needed credit to fund its operations, but because of its nonprofit nature and to an extent its variable cash flow, it could not always obtain credit when needed in its own name.  At trial, the Defendant explained that it was often necessary for him to personally apply for financing and conduct these financial transactions personally because some companies and lending institutions would not advance funds to the nonprofit corporation.

The difficulty in understanding the Wat's management of its irregular cash flow and payment of the various expenses during the period when the Defendant was Director is exacerbated by the fact that little or no financial information was compiled and recorded from year to year, and that many of the transactions related to the Wat were in cash.  For example, when a

member would make a loan to the Wat, no loan documents were executed to memorialize the

transaction.  The Wat's fundraising conducted through food fairs resulted largely in cash

donations.  When other donations were made, most of them were also in cash, and receipts were

either not given or some of the receipt books recording the donations were lost or unavailable.

The monks usually collected donations, and the Defendant would instruct one of the monks to

count and deposit the donations.  But there was limited testimony indicating which monks were

officially appointed to act as treasurers as required by the original bylaws.[3]  One of the monks

who lived near the Wat from 1993 to 1995 testified that he acted as secretary and a records

custodian under the direction of the Defendant but that his tasks were limited to filing, making

deposits when asked, and attending Board meetings.  This monk testified that he did whatever the

Defendant asked of him even if he did not understand the implications of his actions.  Arunee

Schwab (Ms. Schwab), who acted as treasurer during some of the Defendant's tenure as Director,

was the only other officer who testified at trial.  Ms. Schwab testified that she acted as treasurer

from approximately 1996 to 2003 but that she was only the treasurer "in name" and that the

monks took care of finances and record-keeping themselves.[4]

### C.    The Auditor's Report

During the course of the dispute between the parties, they agreed to have an auditor

review the financial records of the Wat and the Defendant's personal financial records.  The

---

[3]    The Defendant testified that there were a number of monks who acted as treasurer while he
was the Director of the Board.  The duties of the Treasurer are articulated in paragraph 6 of Article X of
the Wat's original bylaws and include, *inter alia*, signing all checks, keeping accurate records, and acting
as custodian of all funds belonging to the corporation.

[4]    For example, Monk Isarat provided the financial documents that were used to prepare
various spreadsheets in response to a police investigation of the Wat in 2003.

parties retained Brent E. Litz (Mr. Litz) of Litz & Company to conduct the audit.  Mr. Litz

reviewed transactions and records relating to the following categories: real estate transactions; life

insurance on Phra P. Inhnyvong; Qwest lease income; and receipts and disbursements of the Wat

through November 2003.[5]  Mr. Litz issued his first preliminary report on September 26, 2005 and

another preliminary report on January 27, 2006.  The parties were able to respond to Mr. Litz's

conclusions in these preliminary reports and supply additional information to Mr. Litz regarding

the Wat's and the Defendant's finances.  On November 8, 2006, Mr. Litz issued his final report in

which he made findings and conclusions regarding the four categories of finances the parties

asked him to investigate (Auditor's Report).  Mr. Litz concluded that the Defendant had

converted Wat funds while acting as abbot and Director.  Against this backdrop, the Court will

now examine the transactions at issue in this case.

### 1.      Real Property

While acting as abbot and Director of the Wat, the Defendant was involved in three

separate real property transactions.

### a.      The 715 East House

In 1995, the members of the Wat loaned or donated money to the Wat to purchase a home

located near the temple with a street address of 715 E. 900 N. ("715 East House" or the "Red

House").  The 715 East House was purchased on February 17, 1995 and was intended for use by

the Wat.  At all times relevant hereto, the 715 East House was used as a residence for the monks

living at the Wat.  At the time of the purchase, conveyances and encumbrances of real property

were governed by the Wat's Articles of Incorporation and original bylaws.  Article XX of the

---

[5]      The Plaintiffs are not pursuing allegations of impropriety about the life insurance or Qwest
lease income.

nonprofit corporation's original bylaws required an acquisition or conveyance to be accomplished only "upon resolution passed by a majority vote of a quorum of the membership, consisting of one-third of the entire membership, excluding those member on leave-of-absence."[6]  No evidence was presented showing that the purchase of the 715 East House complied with the requirements of the bylaws.

Approximately two years after the 715 East House was purchased, the Defendant executed a quitclaim deed conveying the 715 East House from the Wat to himself.  This transfer was allegedly approved by five members of the Board on April 4, 1997.[7]  Eight days after the Defendant quitclaimed the 715 East House to himself, the Defendant obtained a loan from CitiCorp in the amount of $38,700 secured by the 715 East House (Loan).  The Auditor's Report indicates that the $38,700 in Loan proceeds were not deposited intact into the Wat's bank account.  Bank statements from the Wat's account with First Security Bank, N.A. (First Security) show eleven deposits totaling $16,439.99 made into the Wat's account from March 22, 1997 to May 21, 1997.  About a year and a half later, on August 26, 1998, the Defendant refinanced the Loan.  The Defendant received net proceeds of $44,898.06 from this refinance (Refinance).

---

[6]        This language is reflected in Article XIX of the Wat's Articles of Incorporation.  On February 22, 2000, the Board amended the Wat's bylaws.  After that date, conveyances and encumbrances of real property were governed by Chapter XIX and required a "resolution passed by a two-thirds of the Board of Trustees, excluding those on leave of absence."  The real property transactions at issue here all occurred before this amendment was effectuated in 2000.

[7]        The notarized letter dated April 4, 1997 was purportedly executed by the Defendant, Sathianpong Wongtao, Ratana West, Nukoon Herron, and Sri Barron.  All were designated as members of the Board.  The letter was signed by Chirasak Boonta who was acting as the secretary of the Wat at that time.  Nukoon Herron later stated in a letter found in the auditor's report dated December 15, 2005 that Nukoon Herron signed the April 4, 1997 letter but did not realize what the purpose of the letter was.  Nukoon Herron also indicated that a notary was not present when the document was signed and there were no other signatures on the letter when she signed it.  The Court discovered the letter while reviewing the exhibits, but no testimony regarding the letter was given at trial.

Again, the proceeds of this Refinance were not deposited intact into the Wat's bank accounts.

The First Security account statements show three deposits into the Wat account totaling

$1,801.50 between August 22, 1998 and September 22, 1998.  The total proceeds from the Loan

and the Refinance of the 715 House were $83,598.06.

The Defendant testified that he used the $83,598.06 obtained from the Loan and the

Refinance to repay the members that had loaned the Wat the money to purchase the 715 East

House in 1995.  According to the Auditor's Report, most of the individuals who loaned money to

the Wat for the purchase of the 715 East House were eventually paid back although there is no

direct evidence, other than the Defendant's testimony, that the Loan and Refinance proceeds

themselves were used to repay these members.  The record does reflect that at least one member

was repaid $30,000 in September of 1998.

The Defendant made the monthly mortgage payments and utility payments for the 715

East House using funds obtained from the Wat's bank account.  The Defendant testified that

when there were insufficient funds in the Wat's account to make the monthly mortgage payment

or the utility payments, members of the Wat would either donate or loan the Wat money to make

the monthly mortgage and utility payments.

On November 30, 1998, the Defendant reconveyed the 715 East House to the Wat.  The

Wat eventually fell behind on its mortgage payments, and, after the Defendant ceased to be abbot

of the Wat, the mortgage-holder foreclosed the 715 East House sometime in 2005.  The Wat is no

longer financially liable for any portion of the mortgage debt.

#### b.    The 701 East House

On April 17, 1998, the Defendant purchased, in his name, real property located at 701

East 900 North in Layton, Utah (the "701 East House" or the "White House").  The Defendant

financed the purchase through Fremont Investment & Loan, but approximately four months later

in August 1998, refinanced this obligation with Associates Financial Services.  The total amount

of the refinance including fees was $245,393.  Approximately $25,000 of the funds from the

refinance were used to pay various credit cards.  Like the 715 East House, mortgage payments

and utility bills for the 701 East House were paid using funds obtained from the Wat's bank

account.  On November 30, 1998, the Defendant — using the same quitclaim deed he used to

transfer the 715 East House back to the Wat — conveyed the 701 East House to the Wat.   There

was no evidence showing that this transfer complied with the requirements in the Wat's bylaws.

Like the 715 East House, the Wat eventually became delinquent on this loan obligation, and the

701 East House was foreclosed in 2004.  The Wat is no longer liable for any portion of the

mortgage debt.

### c.      The Roy House

During trial, the Defendant testified that he personally purchased real property in Roy.

According to the Defendant, this property was to be used as a home for ex-monks who had left

the monkhood.  The Defendant used funds borrowed from Wat members to make a down

payment on the property.  The ex-monks living in the Roy property contributed to the monthly

mortgage payments.  When these funds were insufficient, the Defendant would borrow additional

funds from Wat members to make the monthly mortgage and utility payments on this property.

The Defendant eventually executed a quitclaim deed transferring the Roy property to Malia

Jacobsen, a Wat member.

## 2.    Church Fund Raisers and Distributions from the Wat's Bank Accounts

The Plaintiffs complain that the Defendant failed to account for the substantial funds contributed to the Wat in cash from various sources.  In particular, the Auditor's Report was unable to trace the donations received from the food fairs, including the estimated $14,000 to $16,000 received from the Living Traditions Festival each year, intact into the Wat's bank accounts.  The Auditor's Report also indicated that there was little, if any, need to pay cash for expenses when the Wat maintained a fully functioning bank account.  The Defendant implied that cash was used at times to pay vendors who would not accept the Wat's checks, but otherwise the Wat's lamentable cash accounting system remains unexplained.

While the Defendant acted as the Director of the Wat, various distributions were made out of the Wat's bank accounts[8] to the Defendant personally or payable to companies with whom the Defendant had credit cards.  The parties provided the Court with summaries of disbursements from the Wat bank accounts to the Defendant.  The Defendant testified that any payment made to him, to an account in his name, or to his credit card companies were payments or reimbursements of Wat expenses.  Despite this testimony, the Defendant failed to turnover evidence of reimbursable Wat expenses to the auditor.

There are numerous draws from the Wat bank accounts made out to "CASH."  It is the Defendant's testimony that these draws could have been made for the one of the following purposes: to provide change for patrons at the various food festivals; to pay Wat expenses such as

---

[8]    Mr. Litz examined the following bank accounts used while the Defendant was Director of the Board: Wells Fargo 642; First Security 4223; America First 102-6.

mortgage payments or utilities; to purchase supplies and food for the food festivals; or to repay

loans made by Wat members.

In his analysis, the auditor designated any distribution paid to the Defendant personally, to

his credit card companies, or to "CASH" as "Conversion of Funds."  The criteria for being placed

in that category was that the distribution was made to the Defendant, to "CASH", or to the

Defendant's credit card companies and that there was no documentation showing the purpose of

these distributions.  The auditor explained at trial that not all of the transactions were included in

the report and that this portion of the Auditor's Report was only a "sampling" of the transactions

between the Wat and the Defendant for which there was no documentation to support the

Defendant's statement that he was being reimbursed for legitimate Wat expenses.  It should be

noted that the majority of these payments are in the form of checks that are signed not only by the

Defendant but by another individual as well.

### 3.    Defendant's Tax Returns

Although he was not employed during the following years, the Defendant filed federal tax

returns in 1996, 1997, 1998 and 1999.  Each year the Debtor indicated on Schedule C to Federal

Form 1040 that he provided service to the Asian community.  The Defendant testified that a

person who was employed by the Internal Revenue Service helped him prepare these returns.  The

Defendant provided the necessary financial information to this individual who then used the

information to fill out and prepare the tax returns.

In 1996, the Defendant listed gross receipts or sales of $22,000 and total business

expenses of $21,467.[9]  In 1997, the Defendant listed gross receipts or sales of $30,000 and

---

[9]       The 1996 expenses included: a truck or car expense of $7,344; an insurance expense of
$751; mortgage interest of $1,539; office expenses of $500; rental expenses of $540 for vehicles;

business expenses of $28,428.  In 1998, the Defendant listed gross receipts or sales of $37,540 and business expenses totaling $38,168.  Finally, in 1998, the Defendant listed gross receipts or sales of $42,650 and business expenses of $40,982.  When asked about these returns, the Defendant testified that his only employment from 1996 to 1999 was as abbot and Director of the Board for the Wat.  When asked why the Defendant filed personal returns, the Defendant explained that the amounts listed on Schedule C were the funds he collected each year personally from member donations which he in turn donated to the Wat.  The Defendant also testified that he wanted to qualify for social security benefits so he filed returns for the four-year period listed above.  Because the Defendant was not running another business during this period of time, it appears that all business expenses listed on Schedule C were expenses incurred by the Wat but claimed by the Defendant personally.

### 4.    Education

While living at the Wat, some of the monks pursued educational opportunities.  Some took courses in English as a second language and others pursued degrees at colleges and universities.  The Wat does not pay for these educational expenses.  The Defendant received an advanced degree from a Buddhist university in California while acting as abbot of the Wat.  The Defendant's tuition money was loaned to him by a person with the first name of Penny.  This money was deposited directly into the Wat's account and then the Defendant issued a check (that was counter-signed) to the university to pay his tuition.  It is the Defendant's testimony that this loan was never intended for the Wat's benefit and that the proceeds therefrom were only

---

machinery and equipment; $4,540 in expenses for "other business property"; a $450 expense for repairs and maintenance; a $150 expense for supplies; a $420 expense for taxes and licenses; a $3,401 expense for travel; and a $1,482 expense for utilities.

deposited in the Wat's account to effectuate payment of his tuition. The Defendant claims that he repaid this and all other education loans and expenses from his personal funds.

###### 5.    Travel

From time to time, it is necessary for the Wat monks to travel. Members donate money allowing the monks to travel to other locations to participate in ceremonies and festivities. The Wat members also donate money to bring monks from Thailand or other locations to the Wat. The Defendant testified that he traveled to various states while acting as the abbot for the Wat and that all travel was related to his position as abbot. The Defendant also testified that he traveled to Thailand numerous times during his tenure as abbot to fulfill his duties as the assistant abbot of the Royal Temple in Thailand, to fulfill his duties as counselor to a district advisor in Thailand, and to repay loans made by members in Thailand.

Based on the preceding factual findings, the Court makes the following legal conclusions.

## II.    DISCUSSION

The Plaintiffs have asked this Court to find that the Defendant obtained money or property by "false pretenses, a false representation, or actual fraud" or that the Debtor committed defalcation while acting as a fiduciary to the Wat and its members. The Plaintiffs filed this complaint in their capacity as members of the Wat.[10] The Court will now examine each claim for relief in turn.

---

[10]     There was some discussion during closing arguments that Ms. Schwab had also filed the complaint in her individual capacity. This position was never expressly advocated by the Plaintiffs and has not been part of the pre-trial litigation; therefore, this Court will not address that position.

### A.    Section 523(a)(4)

"[A] finding of nondischargeability under section 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship."[11]  Whether the Defendant is a fiduciary under § 523(a)(4) is a question of federal law, and the Defendant is only considered a fiduciary if an express, technical or statutory trust is present.[12]

To establish an express trust, the Plaintiff must show "(1) sufficient words to create a trust, (2) a clearly defined trust res, and (3) an intent to create a trust relationship."[13]  The Plaintiffs argue that the nonprofit corporation's Articles of Incorporation and bylaws establish the first and second elements of an express trust and that the trust res is clearly defined as all of the Wat's property.  But Plaintiffs have failed to present evidence establishing these three elements. There is no specific document or "words" that create a trust or establish a trust res.  The Articles of Incorporation and bylaws establish the policies and procedures for governing the Wat.  They also set forth the duties and responsibilities of the officers and directors of the Wat.  What they do not contain are sufficient words to create a trust.  There is no language in the articles or bylaws that expressly address a trust.  There has also been no testimony showing an intent to create a trust relationship.  Plaintiffs have attempted to show that the Defendant has a general fiduciary duty of good faith and fair dealing as the abbot of the Wat and as the Director of the Board of

---

[11]     *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997) (internal citation omitted).

[12]     *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996).

[13]     *Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 91 B.R. 961, 965 (D. Utah 1988) (citing *In re Kwiat*, 62 B.R. 818, 821 (Bankr. D. Mass 1986)) *overruled* by *In re Twitchell*, 892 F.2d 86 (10th Cir. 1989) (table).  The Tenth Circuit reversed the district court's *Twitchell* decision but the standard cited in this opinion is still the applicable standard in the Tenth Circuit.

Trustees, but "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith . . .

nor an inequality between the parties' knowledge or bargaining power . . . is sufficient to establish

a fiduciary relationship for the purposes of dischargeability."[14]  Plaintiffs have failed to prove that

an express trust existed between the parties.

The Plaintiffs maintain that a statutory trust exists between the parties that is sufficient to

establish a fiduciary duty under § 523(a)(4).  There are three requirements a statute must satisfy in

order to impose a fiduciary duty under § 523(a)(4): (1) the statute must define the trust res; (2)

the statute must spell out the fiduciary duty; and (3) the statute must impose a trust on the funds

prior to the act creating the debt.[15]  Under § 523(a)(4), it is insufficient that a statute creates a

fiduciary obligation simply for the purposes of that statute.[16]  Instead, all three elements of a

statutory trust must be established.  "Courts have consistently considered state law relevant in

determining whether a technical [or statutory] trust relationship exists for purposes of the

Bankruptcy Code."[17]

---

[14]     *Young*, 91 F.3d at 1372 (internal citations omitted)(holding that attorney-client relationship
was insufficient to establish a fiduciary relationship for § 523(a)(4) purposes).  *But see M-R Sullivan
Manufacturing Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 676 (Bankr. D. Mass. 1998) (holding
that underlying state court judgment for conversion of corporate assets was nondischargeable as to
corporation's president because president was a fiduciary based on underlying Arizona state law);
*Miramar Resources, Inc. v. Shultz (In re Shultz)*, 205 B.R. 952, 958 (Bankr. D.N.M. 1997) (adopting the
reasoning in *In re Snyder*, 101 B.R. 822, 835 (Bankr. D. Mass. 1989) that the "'operative language of
§ 523(a)(4) for corporate directors to be, not the requirement of a technical trust, but the requirement that
[§ 523(a)(4)] only applies to a debt created by a person who was already a fiduciary at the time the debt
was created'").

[15]     *Employers Workers' Compensation Assoc. v. Kelley (In re Kelley)*, 215 B.R. 468, 473
(10th Cir. BAP 1997) (quoting *Medved v. Novak (In re Novak)*, 97 B.R. 47, 59 (Bankr. D. Kan. 1987)).

[16]     *Bowman v.  Hollander (In re Hollander)*, No. 89-0777, 1992 WL 373172 at *3 (N.D.
Ohio 1992) (citing *In re Hayden*, 44 B.R. 9 (Bankr. N.D. Ohio 1984) (not reported)).

[17]     *Sullivan,* 217 B.R. at 675.

The Plaintiffs cite to Section 16-10a-840 of the Utah Code Annotated in support of their
argument that a statutory trust exists between the Plaintiffs and the Defendant. Section 16-10a-
840 is titled "General standards of conduct for directors and officers" (Section 840) and is part of
the Utah Revised Business Corporation Act (Utah's Corporation Act). When asked about this at
trial, Plaintiffs counsel indicated that if there was an applicable section of the Utah Code
establishing a statutory trust then that would be the section of the Code the Plaintiffs were relying
on to establish a statutory trust. Upon review of the Utah Code, the Court finds Section 840
inapplicable to the facts of this case because the Wat is a nonprofit corporation and, as such, it is
governed by the Utah Revised Nonprofit Corporation Act (Nonprofit Act).[18]

Like Utah's Corporation Act, the Nonprofit Act sets forth the general standards of
conduct for directors and officers (Section 822).[19] Section 822 requires officers and directors of
corporations to discharge their duties in good faith with ordinary care and in a manner consistent
with the best interests of the nonprofit corporation. But this section of the Utah Code fails to
establish a statutory trust because Section 822 fails to define a trust res. There is no mention of a
trust res nor are there any trust-like obligations imposed on officers and directors beyond a
general statement that they are to act in good faith and in the best interests of the nonprofit
corporation. As a result, there is nothing over which the officer or director could act as trustee.

Additionally, subsection 5 and 6 of Section 822 provide:

(5) A director, regardless of title, **may not be considered to be a trustee with
respect to any property held or administered by the nonprofit corporation**
including property that may be subject to restrictions imposed by the donor or
transferor of the property.

---

[18]   UTAH CODE ANN. § 16-6a *et seq.* (2004).

[19]   *See* UTAH CODE ANN. § 16-6a-822 (2004).

    (6) A director or officer is not liable to the nonprofit corporation, its members, or any conservator or receiver, or any assignee or successor-in-interest of the nonprofit corporation or member, for any action taken, or any failure to take any action, as an officer or director, as the case may be, unless:

        (a) the director or officer has breached or failed to perform the duties of the office as set forth in this section; **and**

        (b) the breach or failure to perform constitutes:

            (i) willful misconduct; or

            (ii) intentional infliction of harm on:

                (A) the nonprofit corporation; or

                (B) the members of the nonprofit corporation.[20]

Section 822 explicitly states that a director of a nonprofit corporation is not considered a trustee with respect to any property of the nonprofit corporation.  Some courts have found that under a state's corporation act and state common law that an officer or director can be a fiduciary for the purposes of § 523(a)(4).[21]  But the legislature in Utah has specifically excepted officers and directors from being considered trustees of a nonprofit corporation's property.  As a result, it is impossible for Section 822 to establish a statutory trust or fiduciary relationship under § 523(a)(4).  Plaintiffs try to rely on case law indicating that once an express or statutory trust is established, the burden shifts to the Defendant to provide an accounting and verify that he appropriately carried out his duties.[22]  But here, the Plaintiffs have failed to establish that any statutory or express trust existed; therefore, the burden of proof is not upon the Defendant but rests upon the shoulders of the Plaintiffs.  It is this burden of proof that the Plaintiffs have failed to fulfill.

---

[20]    UTAH CODE ANN. § 16-6a-822(5) and (6) (2004) (emphasis added).

[21]    *See* footnote 13 *supra*.

[22]    *Storie*, 216 B.R. at 288.

The Tenth Circuit has indicated that defalcation requires at least some portion of

misconduct.[23]  The Plaintiffs have not pointed the Court to any asset that the Defendant obtained

with Wat funds, nor have the plaintiffs established that the Defendant used funds for anything

other than Wat expenses.[24]  What the Plaintiffs have established is that the Defendant was a poor

accountant and that he failed to adhere to corporate formalities.  The Plaintiffs would have this

Court assume that funds were used for improper purposes and infer that a trust relationship

existed between the Defendant and the Wat members.  But, as relevant case law points out, an

implied trust or an inference of a trust is insufficient to establish that a fiduciary relationship

existed between the parties in this case.  Furthermore, the Nonprofit Act explicitly indicates that

officers and directors of nonprofit corporations are not considered trustees over the nonprofit

corporation's property.  This Court must be able to make findings of fact and conclusions of law

based on established facts.  A bundle of inferences with no evidence to support them is insufficient

to establish such findings and conclusions.  The Court cannot grant the relief they request under

§ 523(a)(4) because the Plaintiffs have failed to show that an express trust existed between the

Defendant and the Plaintiffs and have failed to establish that a statutory trust existed.

### B.      Section 523(a)(2)(A)

Plaintiffs have also argued that the Defendant obtained money by false pretenses and false

representations and that these acts establish a debt owed to the Plaintiffs that should be

nondischargeable.  "[F]or a debt to be determined non-dischargeable . . . the false representation

---

[23]      *Oklahoma Grocers Assoc., Inc. v. Millikan (In re Millikan)*, 188 Fed. Appx. 699, 2006
WL 1755960 (10th Cir. 2006) (this opinion was not selected for publication).

[24]      It appears that the Defendant did use Wat expenses to offset his personal tax liability, but
this act itself is not sufficient to establish a claim for relief under § 523(a)(4).

or false pretense must involve moral turpitude or intentional wrong.  And, the representations must have been made knowingly and fraudulently" and relied upon justifiably by the other party.[25] "False pretenses or representations are representations knowingly and fraudulently made that give rise to debt."[26]  Plaintiffs argued that the Defendant — while holding himself out as a Buddhist monk, the abbot of the Wat, and Director of the Board of Trustees — took money that members donated to the Wat and used the donations for his personal benefit.  In making the donations, the members would have assumed that the Defendant would only use the donations for the benefit of the Wat.  At trial, the parties did not focus on this claim for relief.  As a result, the evidence and argument allocated to this claim are significantly limited.  The first problem with the Plaintiffs' position is that implied fraud or an assumption of fraud is insufficient to establish a claim under § 523(a)(2)(A).[27]  The Plaintiffs may have made assumptions about the Defendant and his conduct, but the Plaintiffs did not provide the Court with any examples of the Defendant actually making a false representation.  Second, the Plaintiffs were unable to provide the Court with evidence that the Defendant actually made false representations to the Plaintiffs let alone knowingly and intentionally upon which they justifiably relied, and that the Defendant obtained money or property from the Plaintiffs as a result.  Therefore, this Court cannot award the Plaintiffs relief under § 523(a)(2)(A).

---

[25]     *Jack Master Inc. v. Collins (In re Collins)*, 28 B.R. 244, 248 (Bankr. W.D. Okla. 1983) (internal citation omitted).  The *Collins* court used the former standard of reasonable reliance. Subsequent case law has established that a creditor's reliance must be justifiable, not reasonable. *See also Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir. BAP 2002) (examining the elements necessary to establish false pretenses, a false representation, or actual fraud).

[26]     *Lang v. Lang (In re Lang)*, 293 B.R. 501, 514 (10th Cir. BAP 2003) (internal citations and quotations omitted).

[27]     *Collins*, 28 B.R. at 248.

### III.    CONCLUSION

In the legal world, there are times when a defendant's actions are suspect but the law does not provide a vehicle for relief.  This is one of those times.  The Defendant in this case may have been a poor money manager, a poor accountant, and an incompetent Director, but these shortcomings do not establish the elements necessary to maintain a § 523(a)(4) claim for relief. For the reasons articulated above, the Court finds that the Plaintiffs were not able to establish that a § 523(a)(4) fiduciary relationship existed between the Defendant and the Plaintiffs.  The Plaintiffs § 523(a)(2)(A) claim was also not proven.  A separate order will be issued in conjunction with this opinion.

------------------------------------------END OF DOCUMENT------------------------------------------

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

Kevin P. Sullivan
Farr, Kaufman, Sullivan, Jensen, Medsker, Conklin, Olds & Nichols
205 26th Street, Suite 34
Ogden, UT 84401
        *Counsel for Plaintiffs*

Noel S. Hyde
5926 S. Fashion Pointe Dr., Suite 200
S. Ogden, UT 84403
        *Counsel for Defendant*